United States District Court
Southern District of Texas
**ENTERED**
July 22, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* GLEN JAMESON, | § § § § § | |
| Plaintiff. | | |
| V. | § § | CIVIL ACTION NO. 3:20-cv-00172 |
| WBI ENERGY TRANSMISSION, INC., *et al.*, | § § § § § | |
| Defendants. | | |

## **MEMORANDUM AND RECOMMENDATION**

Plaintiff Glen Jameson ("Jameson") brings this *qui tam* action against 12 gas storage operators (collectively, "Defendants").[1] Jameson alleges that each Defendant, acting individually, knowingly concealed or knowingly avoided its obligation to pay various gas-production royalties to the United States in violation of the False Claims Act ("FCA").

Relying on Federal Rules of Civil Procedure 9(b) and 12(b)(6), Defendants filed a Joint Omnibus Motion to Dismiss Relator's Amended Complaint ("Joint Motion to Dismiss"). *See* Dkt. 95. Each defendant also filed an individual motion to dismiss. *See* Dkts. 96–105. I held a hearing on the motions, after which Defendants filed limited supplemental briefing. Having considered the parties' oral arguments and reviewed the briefing and applicable law, I recommend the Joint Motion to Dismiss be **GRANTED**, and the other motions denied as moot.

---

[1] Defendants are (1) WBI Energy, Inc. ("WBI Energy"); (2) WBI Energy Transmission, Inc. ("WBI-ET"); (3) MDU Resources Group, Inc. ("MDU"); (4) Black Hills Gas, LLC; (5) Colorado Interstate Gas Company, L.L.C.; (6) Columbia Gas Transmission, LLC; (7) Dominion Energy Questar Pipeline, LLC; (8) El Paso Natural Gas, L.L.C.; (9) Louisville Gas and Electric Company ("Louisville"); (10) Northwestern Corporation; (11) Public Service Company of Colorado; and (12) Tallgrass Interstate Gas Transmission, LLC. I will refer to WBI Energy, WBI-ET, and MDU, collectively, as the "WBI Defendants."

## THE FALSE CLAIMS ACT

"[F]irst passed at the behest of President Lincoln in 1863 to stem widespread fraud by private Union Army suppliers in Civil War defense contracts," the FCA "is intended to protect the Treasury against the hungry and unscrupulous host that encompasses it on every side." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 184 (5th Cir. 2009) (cleaned up). The FCA's reverse false claims provision imposes liability on

> any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G). This "is called a reverse false claim because the action of the defendant results not in improper payment to defendant from the Government, but rather no payment to the Government when payment is otherwise obligated." *U.S. ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003).[2] At issue in this case is the second part of the reverse false claims provision: knowing concealment or knowing and improper avoidance.

The FCA permits a private person, known as a "relator," to bring an action in the name of the United States for a violation of the FCA. *See* 31 U.S.C. § 3730(b)(1). Such lawsuits are commonly referred to as *qui tam* suits. "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means who pursues this action on our Lord the King's behalf as well as his own." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000) (quotation omitted). Relators have standing to sue in *qui tam*

---

[2] The majority of FCA cases deal with the *presentment* of false claims for payment *from* the Government, or the making of false statements material to a claim for payment from the Government. *See* 31 U.S.C. § 3729(a)(1)(A)–(B); *United States ex rel. Angelo v. Allstate Ins. Co.*, No. 23-1196, 2024 WL 3199312, at *3 (6th Cir. June 27, 2024) ("By way of background, most cases brought under the False Claims Act proceed in a similar way: a relator alleges that the defendant fraudulently sought to obtain overpayment from the government by, for example, making a claim for government payment in an amount greater than what the defendant was entitled to receive.").

actions because "a *qui tam* relator is, in effect, suing as a *partial* assignee of the United States." *Id.* at 773 n.4.

The FCA encourages private citizens to report fraud by promising them a percentage of any eventual recovery obtained through a final judgment or settlement. *See* 31 U.S.C. § 3730(d). "After the relator has filed suit, the action is sealed for sixty days while the government decides whether to intervene." *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 325 n.3 (5th Cir. 2011) (citing 31 U.S.C. § 3730(b)(2)). "If the government chooses not to intervene, the relator may proceed independently." *Id.* (citing 31 U.S.C. § 3730(e)(4)(B)). If the government intervenes and takes over the action, the relator may receive 15 to 25 percent of the proceeds of the action or settlement. *See* 31 U.S.C. § 3730(d)(1). If the government declines to intervene, the relator may receive 25 to 30 percent. *See id.* § 3730(d)(2).

## BACKGROUND

Defendants are 12 unrelated (with the exception of the three WBI Defendants) corporate entities that operate underground gas storage reservoirs across 10 states. Underground gas storage reservoirs allow for the indefinite storage of processed natural gas. Gas storage operators, like Defendants, inject natural gas into storage until it is needed. When the natural gas is later withdrawn, it is sometimes possible to withdraw more natural gas than was injected, or to withdraw other gas products in addition to natural gas. Jameson alleges that each Defendant, acting individually, violated the FCA by knowingly concealing or knowingly and improperly avoiding its obligation to pay royalties to the United States (the "Government") on (1) native gas production; (2) condensate production; and (3) British Thermal Unit ("BTU") enrichment.[3]

---

[3] Condensate is a byproduct of native gas that is removed soon after native gas extraction and before the native gas is processed. BTU is a measure of the amount of heat required to raise the temperature of one pound of water one degree Fahrenheit. Gas with a higher BTU content is more valuable because it generates more heat.

Jameson's investigation into Defendants' operations began in 2015 when the Office of Natural Resources Revenue ("ONRR") hired Jameson as a petroleum engineer. ONRR, a federal agency within the Department of the Interior, collects royalties owed under federal oil and gas leases and gas storage agreements ("GSAs"). Jameson's duties include working with engineers and attorneys "to ensure compliance with federal oil and gas leases," inspecting gas storage facilities, and ordering lessees to file accurate production reports. Dkt. 92 at 17. Gas storage reservoirs often contain large amounts of recoverable native gas (i.e., unprocessed gas). If an operator withdraws more gas than it has injected, it may be required by its GSA to pay royalties to the Government on the native gas production.[4]

One of Jameson's first assignments with ONRR involved reviewing whether Questar Energy Trading Company ("QET"), a non-defendant operator of a gas storage reservoir in Wyoming, was paying the correct amount of fees to the Government under its GSA. Jameson learned this operator reached a settlement with the Government in 2012 for failing to pay royalties for BTU enrichment as required under its GSA. According to Jameson, "[q]uestions arose among ONRR staff" as to whether the operator owed additional royalties, although ultimately ONRR determined the operator was properly paying royalties. *Id.* at 81–82.

After this experience, "Jameson was curious to see what the level of compliance with other federal GSAs was by other" operators of gas storage reservoirs. *Id.* at 83. "While he was not assigned this task, Jameson took it upon himself to read the terms of other federal GSAs and examine whether other GSA operators were complying with their GSA terms." *Id.*

Jameson began by reviewing royalty reports (ONRR-2014), which all gas storage operators must submit to ONRR. *See* 30 C.F.R. § 1210.51(a). These reports

---

[4] Alternatively, a GSA may impose only a base storage fee on gas. *See* 30 U.S.C. § 226(m) (The authorization of the subsurface storage of oil or gas "may provide for the payment of a storage fee or rental on such stored oil or gas or, in lieu of such fee or rental, for a royalty other than that prescribed in the lease when such stored oil or gas is produced in conjunction with oil or gas not previously produced.").

record, among other values, the volume of gas injected and withdrawn from a gas storage reservoir, and the royalty due. All Defendants submitted their royalty reports as required. Jameson reviewed ONRR's collection of Defendants' royalty reports dating as far back as 1984, ultimately concluding—based on the reports that Defendants themselves submitted to ONRR—that Defendants owe royalties on native gas production.

While reviewing royalty reports, Jameson realized that Defendants were not filing production reports (ONRR-4054). Production reports must be filed by operators of "a Federal or Indian oil and gas lease or federal approved unit or communitization agreement." 30 C.F.R. § 1210.101(a). These production reports document the BTU content of gas sold or transferred to a facility and the amount of native gas and condensate, among other substances, produced under a federal oil and gas lease. Jameson contends that Defendants are operators of federal oil and gas leases who must file production reports with ONRR and pay royalties on the production reported. *See* 30 U.S.C. § 226(b)(1)(A) ("A lease shall be conditioned upon the payment of a royalty at a rate of not less than [12.5] percent in amount or value of the production removed or sold from the lease.").[5]

Jameson instituted this *qui tam* action on May 21, 2020. On October 25, 2021, after several extensions of time, the Government declined to intervene. Judge Jeffrey V. Brown unsealed the case on November 17, 2021. On August 12, 2022, Jameson filed his Amended Complaint, which is the operative pleading. *See* Dkt. 92. In their Joint Motion to Dismiss, Defendants dispute Jameson's native gas production calculations, arguing they are inaccurate because the forms in ONRR's possession only date back to 1984, while all but one of Defendants' GSAs pre-date

---

[5] When Jameson filed his complaint, the federal royalty rate for gas extraction was 12.5 percent. Congress since increased the royalty rate to 16.67 percent. *See* Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 50262, 136 Stat. 1818 (2022).

1984.[6] In plain language, Defendants contend that Jameson's "allegations are akin to a bank claiming that an account holder has withdrawn more money than she deposited, while reviewing deposits and withdrawals from only the past five years when her account has been active for ten years." Dkt. 95 at 18. Defendants also contend that, "[u]nlike operators of production leases, operators of GSAs are not subject to royalty payment and production reporting requirements." *Id*. at 21. Moreover, Defendants argue, "withdrawals do not constitute production." *Id*. at 25. In essence, Defendants argue that Jameson cannot establish that they have an obligation to pay the Government.

Defendants also argue that Jameson fails to allege that they acted with the requisite scienter; that Jameson fails to allege materiality; and that any violations alleged to have occurred before May 21, 2010 are time-barred. As to the latter point, Jameson's counsel conceded at oral argument that he is "not entitled to anything before May 21, 2010." *See* Dkt. 147-1 at 10. As for materiality, it is one of many arguments I need not address. That is because, if ever a case should be dismissed at the pleading stage for failure to allege fraud, it is this case.

## LEGAL STANDARDS

### A. RULE 12(b)(6)

A complaint may be dismissed when the plaintiff has failed to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements

---

[6] The only GSA that entirely post-dates 1984 is the Muldraugh GSA, executed by Louisville in 1992 with a retroactive effective date of January 1988. Other GSAs were executed after 1984, but they are simply amendments to GSAs that pre-date 1984.

6

of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. At this initial pleading stage, I accept as true all well-pleaded factual allegations in the Amended Complaint. *See Twombly*, 550 U.S. at 555–56.

### B.   RULE 9(b)

The Fifth Circuit has held "that a complaint filed under the False Claims Act must meet the heightened pleading standard of Rule 9(b)." *Grubbs*, 565 F.3d at 185. Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). More specifically, Rule 9(b) requires that "a plaintiff pleading fraud must set forth the who, what, when, and where before access to the discovery process is granted." *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (cleaned up).

The Fifth Circuit has mandated that Rule 9(b)'s heightened standard for pleading be applied "with bite and without apology." *Grubbs*, 565 F.3d at 185 (quotation omitted). "The time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b)." *Dow Chem. Co.*, 343 F.3d at 329 (cleaned up) (applying Rule 9(b)'s heightened pleading requirement to a reverse false claims case). A plaintiff's failure to plead an FCA claim in compliance with Rule 9(b) is considered a failure to state a claim under Rule 12(b)(6). *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997).

## ANALYSIS

### A.   THE RULE 9(b) PLEADING STANDARD IS NOT RELAXED IN THIS CASE.

As an initial matter, Jameson argues he is entitled to a relaxed Rule 9(b) pleading standard because Defendants have exclusive control over gas injection and withdrawal data prior to 1984. *See* Dkt. 109 at 22. In other words, Jameson contends that any pleading deficiency resulting from incomplete calculations should not lead to dismissal because only through discovery can he obtain full injection and withdrawal histories.

Even in FCA cases, "when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the Rule 9(b) standard is relaxed, and fraud may be pled on information and belief, provided the plaintiff sets forth the factual basis for his belief." *United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999). Yet, if "documents containing the requisite information were possessed by other entities," the plaintiff is not entitled to this relaxed standard. *Id.* In *Russell*, the Fifth Circuit declined to relax Rule 9(b)'s pleading requirement because, in addition to the defendants, a government agency also possessed the necessary information. That is also the case here.

Here, Jameson admits that he reviewed only ONRR's database of royalty reports, and that database lacks pre-1984 data. *See* Dkt. 92 at 14 & n.4. But every one of Defendants' GSAs require them to also file injection and withdrawal data with either the U.S. Geological Survey ("USGS") or the Bureau of Land Management ("BLM"),[7] which are separate bureaus within the Department of the Interior.[8] Jameson makes no allegations regarding Defendants' compliance with these reporting requirements, "nor has he argued that he tried but failed to obtain the information." *Sealed Appellant I v. Sealed Appellee I*, 156 F. App'x 630, 634 (5th Cir. 2005) (affirming district court's refusal to relax Rule 9(b) standard and subsequent dismissal of plaintiff's FCA claim). Thus, this case is unlike the case cited by Jameson, where the relevant facts were known solely to Defendants. *See*

---

[7] *See* Dkt. 92-4 at 15 (requiring quarterly reports to USGS); Dkt. 92-10 at 3, 5 (same); Dkt. 92-11 at 7 (same); Dkt. 92-12 at 3, 5 (same); Dkt. 92-13 at 5 (same); Dkt. 92-14 at 4–5 (requiring annual report to USGS); Dkt. 92-15 at 5, 7 (requiring quarterly reports to USGS); Dkt. 92-16 at 4, 9 (requiring annual reports to BLM); Dkt. 92-17 at 4–5 (requiring quarterly reports to USGS); Dkt. 92-18 at 2, 5 (requiring quarterly reports to BLM); Dkt. 92-19 at 2 (requiring annual report to USGS); Dkt. 92-20 at 4, 7 (requiring quarterly reports to BLM); Dkt. 92-21 at 5, 8 (same); Dkt. 92-22 at 6 (requiring quarterly reports to USGS); Dkt. 92-23 at 3, 6 (requiring quarterly reports to BLM); Dkt. 92-24 at 5 (requiring quarterly reports to USGS); Dkt. 92-25 at 4, 6 (requiring quarterly reports to BLM); Dkt. 92-26 at 1, 6 (same); Dkt. 92-27 at 3, 6 (requiring quarterly reports to USGS); Dkt. 92-28 at 3, 5 (same).

[8] *See Bureaus & Offices*, U.S. DEP'T OF THE INTERIOR, https://www.doi.gov/bureaus (last visited July 18, 2024).

8

*United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) (holding that plaintiff's complaint satisfied Rule 9(b) because certain information—specifically, "which employees handle federal billing for procedures reimbursable under Medicare, and in particular, who reviewed reimbursement claims"—was exclusively within defendant's control). The USGS or BLM should have pre-1984 reports from Defendants, and Jameson has not alleged otherwise. Accordingly, Jameson must satisfy Rule 9(b)'s heightened pleading standard.

**B.     JAMESON FAILS TO ALLEGE ANY FRAUDULENT ACTIVITY.**

Jameson asserts a single cause of action against each Defendant pursuant to the FCA's reverse false claims provision. *See* 31 U.S.C. § 3729(a)(1)(G). To establish a reverse false claims violation, Jameson must allege (1) an obligation to pay money to the Government; and (2) that the defendant knowingly concealed or knowingly and improperly avoided or decreased that obligation. *See United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1034 (5th Cir. 2016). I will assume, without deciding, that Defendants were obligated to submit production reports and pay royalties to the Government. Even so, Jameson's FCA claims against Defendants fail because he does not allege knowing concealment or knowing and improper avoidance of the obligation to pay.

### 1.     *The FCA's Scienter Standard*

The FCA defines "knowingly" as having (i) "actual knowledge of the information," (ii) acting "in deliberate ignorance of the truth or falsity of the information," or (iii) acting "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). It follows that "the term 'knowingly' must be interpreted to refer to a defendant's awareness of *both* an obligation to the United States *and* his violation of that obligation." *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 436 (6th Cir. 2016).

"This is an elevated standard, as a finding of negligence or gross negligence is not sufficient to satisfy the scienter requirement." *United States ex rel. Johnson v. Kaner Med. Grp., P.A.*, 641 F. App'x 391, 394 (5th Cir. 2016); *see also United*

9

*States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008) ("Though the FCA is plain that 'proof of specific intent to defraud' is not necessary, *see* § 3729(b), that *mens rea* requirement is not met by mere negligence or even gross negligence."). The "proper application of [this standard] is critical to ensuring that FCA liability attaches only for false or fraudulent claims and not for accidental or even negligent breaches of contract." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1261 (D.C. Cir. 2010).

Although Rule 9(b) allows knowledge to be pleaded generally, "simple allegations of fraudulent intent will not suffice, and plaintiffs must set forth specific facts supporting an inference of fraud." *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 635 (N.D. Tex. 2018) (quotation omitted), *aff'd*, 779 F. App'x 250 (5th Cir. 2019).

### 2. *Jameson Has Not Alleged Knowing Concealment or Knowing and Improper Avoidance.*

Jameson alleges that "as experienced oil and gas companies, each [Defendant] was obligated to know and knew they had an obligation to report additional production from federal lands." Dkt. 92 at 104. But "the conclusory allegation that Defendants must have known by virtue of their size and sophistication is not a substitute for pleading facts supporting an inference of fraud." *United States ex rel. Frey v. Health Mgmt. Sys., Inc.*, No. 4:21-cv-02024, 2023 WL 2563239, at *10 (S.D. Tex. Feb. 10, 2023) (dismissing FCA claims for failure to plead scienter). Moreover, "the FCA's scienter element refers to [Defendants'] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023).[9]

---

[9] In their briefing and at oral argument, Jameson and Defendants vigorously disputed whether Defendants' interpretation of the relevant regulations was objectively reasonable. This dispute stemmed from a pre-*Schutte* Supreme Court decision—*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)—that lower federal courts had applied in FCA cases to permit a defendant to avoid FCA liability if it had "a permissible interpretation of the relevant provision" and if no "authoritative guidance . . . warned it away from that

Jameson continues that, "[b]y virtue of the Defendants' failure to disclose the production and extraction of minerals, including native gas and condensate, from federal lands, Defendants have knowingly concealed or knowingly and improperly avoided an obligation to pay royalties to the federal government." Dkt. 92 at 104. In other words, Jameson alleges that "failure to report" equates to fraud. *Id.*; *see also* Dkt. 147-1 at 19 (Jameson's counsel agreeing that "failure to pay isn't in and of itself sufficient" to establish concealment or avoidance).

Defendants counter that the "failure to submit a form that is not required is not a violation of any statutory, regulatory, or contractual obligation." Dkt. 95 at 25 (citing *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (Jones, J., specially concurring)). I would go a step further and argue that failure to submit even a form that *is* required is not—standing alone—knowing concealment or knowing and improper avoidance. As Judge Edith Jones noted in her *Southland* concurrence, "the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of regulations are not fraud unless the violator knowingly lies to the government about them." *Southland*, 326 F.3d at 682 (quoting *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999)) (cleaned up). Yet, a failure-to-report regulatory violation is all that Jameson has alleged here. That is not enough.

Jameson argues that "a claim under the second part of the reverse false claims provision only requires that a defendant was aware of an obligation and

---

reading." *United States v. SuperValu Inc.*, 9 F.4th 455, 468 (7th Cir. 2021), *vacated and remanded sub nom. Schutte*, 598 U.S. 739. *Safeco* was notably *not* an FCA case. In fact, *Safeco* was not even a fraud case. Three months after oral argument in this case, the Supreme Court confirmed that *Safeco* is inapplicable in the FCA context. *See Schutte*, 598 U.S. at 754 ("Safeco interpreted a different statute, the [Fair Credit Reporting Act], which had a different *mens rea* standard."). *Schutte* also confirmed that "we do not look to legal interpretations that [defendants] did not believe or have reason to believe at the time they submitted their claims." *Id.* at 755. Accordingly, I do not reach the parties' now-moot arguments regarding the objective reasonableness of Defendants' interpretation of the relevant regulations.

evaded it, as is pointed out in the decision on which Defendants rely." Dkt. 109 at 23–24 (citing *U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, No. 5:13-cv-2145, 2015 WL 7575937, at *1 (N.D. Ohio Nov. 25, 2015)). Jameson contends that "[p]arties to government contracts are charged with knowledge of the contracts' terms and any relevant laws," and because he "discusses the terms of each Defendant's GSA(s) and the payment obligations imposed," he has sufficiently pleaded each Defendant's knowledge of its legal obligations. Dkt. 109 at 28. In other words, Jameson argues that because the relevant regulations and contracts—which are known to Defendants—establish Defendants' obligation to pay royalties to the Government, Defendants necessarily knew about their obligation to pay, and to file production reports. Yet, that is precisely the type of allegation that was found *lacking* in *Harper*, and that led to dismissal.

In *Harper*, the relators argued that the defendant's actions triggered a reverter clause in a deed issued by the Government, and that the defendant violated the FCA by retaining the income derived from the land and failing to return possession of the land to the Government. The *Harper* court found, as I assume here, that the defendant had an obligation. Yet, the court held that relators "failed to allege a reverse false claim with particularity" because, at most, relators alleged "a breach of the Deed, and it is well settled that 'a mere breach of contract does not give rise to liability under the False Claims Act.'" *Id.* at *10 (quoting *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 824 (7th Cir. 2011)). As the Sixth Circuit explained in affirming the district court,

> The relators' complaint and proposed amended complaint do recount the restrictions in the 1949 deed that MWCD received from the United States, and also recount MWCD's decision to sign leases of subsurface mineral rights on the land it received pursuant to the 1949 deed. These facts could create the inference that MWCD knew about the deed restrictions when it signed the leases, and such an inference would be consistent with the theoretical possibility that MWCD in fact believed that the restrictions forbade it from executing the oil and gas leases. But again, Rule 8's "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. Where

12

a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."

*Harper*, 842 F.3d at 438 (quoting *Iqbal*, 556 U.S. at 678).

In simpler terms, if establishing the obligation *also* established scienter, it would be a one-part test, not a two-part test. The obligation prong cannot subsume the scienter prong. Thus, establishing Defendants' obligation does not *ipso facto* establish Defendants' knowledge, too.[10] *See also United States ex rel. Ligai v. ETS-Lindgren Inc.*, No. CIV.A. H-112973, 2014 WL 4649885, at *13 (S.D. Tex. Sept. 16, 2014) ("The allegations . . . may support a claim that [Defendant] breached its government contract, but that is insufficient for a False Claims Act cause of action, reverse or otherwise."), *aff'd sub nom. United States ex rel. Ligai v. ESCO Techs., Inc.*, 611 F. App'x 219 (5th Cir. 2015).

Jameson contends that Defendants also knew they were obligated to report production because QET allegedly "performed as required under its GSA, leases, and federal law by reporting additional production and paying royalties on it." Dkt. 92 at 104. But Jameson cannot establish Defendants' knowledge of their obligation to pay or their obligation to file production reports based on the actions of a single, unrelated company. Notably, *unlike every single one of Defendant's GSAs here*, QET's GSA contained an explicit provision requiring royalty payments for BTU enrichment. *See* Dkt. 92-29 at 4 ("Because the Nugget formation is a depleted retrograde condensate reservoir, it may contain unrecovered liquids that would enrich and increase the value of the lean injected gas. This enrichment should be measured, a Btu balance maintained, and payment for the enrichment made.").

I will set aside for a moment that "the FCA's scienter element refers to [Defendants'] knowledge and *subjective* beliefs." *Schutte*, 598 U.S. at 749 (emphasis added). Because none of Defendants' GSAs contain a similar provision to QET's GSA, not even an *objectively* reasonable person would equate QET with

---

[10] Again, I assume Defendants' obligation for the sake of argument. Nothing in this opinion should be construed to suggest that such an obligation is legally cognizable.

13

Defendants. But even if it is reasonable to equate QET with Defendants (it is not), Jameson still has not alleged why any Defendant, much less each of them, would know about QET in the first place. Jameson does not allege that QET's settlement was public, or that it was common in the industry for gas storage operators to publicize or discuss their GSAs, leases, and royalty payments. Thus, Jameson cannot rely on QET to allege Defendants' knowledge.

Because Jameson has not alleged Defendants' knowledge, he necessarily has not alleged knowing concealment or knowing and improper avoidance. Jameson, of course, contends otherwise. Jameson cites *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370 (S.D.N.Y. 2015) for the proposition that "avoid" means "to refrain from, elude, ignore, keep away from, keep aloof from, shun, steer clear of, and sidestep." Dkt. 109 at 24. These are indeed synonyms for avoidance, but what Jameson overlooks is that all these verbs require awareness and a choice. After all, to ignore something, one must know where *not* to look. *Kane* offers a perfect example of the type of choice one might make to avoid an obligation. In *Kane*, the defendants fired the person tasked with investigating the scope of potential overpayments from the Government after he "presented them with a list of potentially affected claims," after which the defendants "did nothing further with his analysis." 120 F. Supp. 3d at 394. In other words, the *Kane* defendants shot the messenger and then buried their heads in the sand—*that* is knowing and improper avoidance. Jameson offers no allegations that are even remotely comparable here.

Citing *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242 (3d Cir. 2016), Jameson insists that "failure to make required disclosures shows knowing concealment." Dkt. 109 at 24. But the *Victaulic* court was not addressing the sufficiency of allegations concerning knowing concealment or knowing and improper avoidance—it was addressing whether a failure to pay marking duties could give rise to FCA liability. *See* 839 F.3d at 252–53. Specifically,

14

> Victaulic . . . knew its goods were not marked properly and, therefore, knew that the imported pipe fittings should not have been released from government custody. Had Victaulic informed the government of this state of affairs, the goods would not have been allowed into the country. By staying silent, [relator] alleges that Victaulic made a choice—to pay the ten percent marking duty owed on its goods, if its scheme was discovered, instead of paying to have the goods marked properly, re-exported, or destroyed. Hence, . . . Victaulic knowingly concealed information from the government by not informing customs officials that the imported pipe fittings were not marked properly. According to [relator], once the pipe fittings cleared customs, Victaulic knew it owed marking duties that accrued on importation but did not pay them.

*Id.* at 254. At a surface level, Jameson might analogize to *Victaulic* by saying that both failed to report (Victaulic its unmarked goods, Defendants their gas production), and both then failed to pay. But that would be an incorrect analogy.

Unlike Defendants, who Jameson alleges had an obligation to pay the Government *irrespective* of their failure to report, Victaulic's failure to disclose its unmarked goods induced the Government to act, and the Government's act of releasing those goods from custody is what gave rise to Victaulic's obligation to pay the Government—an obligation it then avoided. Had Victaulic disclosed its unmarked pipe fittings, it could have either paid to have the goods marked properly, or else the Government would have re-exported or destroyed them. *See* 839 F.3d at 254. None of these options involved making a payment to the Government. In other words, if Victaulic *had disclosed* its unmarked pipe fittings, it would have owed the Government *nothing*. The Third Circuit declined "to address how, *if at all*, the FCA would apply in the absence of an affirmative obligation to disclose *separate from the obligation to pay*." *Id.* at 255 n.56 (emphasis added). Thus, *Victaulic* is inapposite.

* * *

Jameson has failed to plausibly allege specific facts permitting a reasonable inference that Defendants knowingly concealed or knowingly and improperly

15

avoided an obligation to pay the Government. Accordingly, his FCA claims must fail.

## CONCLUSION

For the reasons explained above, I recommend Defendants' Joint Motion to Dismiss (Dkt. 95) be **GRANTED**, and the remaining motions (Dkts. 96–105) be **DENIED AS MOOT**.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(c); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 22nd day of July 2024.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE